

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00579-CV

**IN THE INTEREST OF E.M.T.**, J.A.T., E.C.S., E.M.S., E.D.S., and E.A.C., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2022PA01657
Honorable Raul Perales, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Irene Rios, Justice
                 Lori Massey Brissette, Justice
                 H. Todd McCray, Justice

Delivered and Filed: May 7, 2025

AFFIRMED

Appellant Mother appeals the trial court's order terminating her parental rights to her children, J.A.T., E.C.S., E.M.S., E.D.S., and E.A.C. (collectively, "the children").[1] In her sole issue, Mother challenges the sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in the children's best interests. Father C.T. and Father D.S.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to the children using their initials or as "the children." *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2). We refer to the parents as "Mother," "Father C.T.," "Father D.S.," and "Father D.C." Father C.T. is the father of E.M.T. and J.A.T. Father D.S. is the father of E.C.S., E.M.S., and E.D.S. Father D.C. is the alleged father of E.A.C. The trial court's order did not terminate Father C.T.'s and Mother's parental rights to E.M.T. Instead, Father C.T. and Mother were both named possessory conservators of E.M.T. The trial court's order terminated Father C.T.'s parental rights to J.A.T.; Father D.S.'s parental rights to E.C.S., E.M.S., and E.D.S.; Father D.C.'s parental rights to E.A.C.; and Mother's parental rights to all the children except E.M.T.

also challenge the sufficiency of the evidence supporting the trial court's finding that termination of their parental rights is in the best interests of their respective children. Father D.C. was unable to participate in the trial via zoom on the fourth and fifth day of trial because the facility where he was incarcerated was without power. In his sole issue, Father D.C. argues the trial court abused its discretion when it proceeded with trial without Father D.C.'s participation. We affirm the trial court's termination order.

## BACKGROUND

The Department of Family and Protective Services ("the Department") initially became involved in the underlying case in September 2022. There were allegations E.A.C.'s medical needs were being neglected because she was sick, wasn't gaining weight, and had white feces and sores on her bottom. There were also allegations of neglectful supervision of the other children. Specifically, it was alleged the children were left home alone for several days without food, and the home was in an unsanitary condition with dog feces on the ground. Finally, there were allegations Mother was abusing illegal drugs.

On October 12, 2022, the Department filed a petition seeking emergency removal, temporary managing conservatorship of the children, and termination of parental rights. The trial court held a five-day bench trial beginning on April 3, 2024 and concluding on July 16, 2024. The trial court heard testimony from: Monica Clark, the Department's caseworker throughout most of the legal case; Vanessa Knight, the Family Drug Court Monitor for Mother; Carlos Castillo-Nunez, Father D.S.'s counselor; Chelsea Conaway, E.C.S.'s and E.M.S.'s counselor; Yadi Puente, E.D.S.'s counselor; Foster Mother, E.C.S., E.M.S., and E.D.S.'s foster mother;[2] Latricia Prather, the Department's caseworker since May 2024; Michell Hamelwright-Guerrero, Father D.S.'s

---

[2] To protect the identity of the children, we refer to E.C.S., E.M.S., and E.D.S.'s foster mother as "Foster Mother", their foster father as "Foster Father" and their foster parents collectively as "Foster Parents."

domestic violence counselor; E.C.S., E.M.S., and E.D.S.'s paternal grandmother; the children's maternal grandmother;[3] the children's maternal uncle; Father C.T.; Father D.S.; and Mother. E.M.T. also testified at trial.

On July 22, 2024, the trial court signed an order terminating Mother's parental rights to all the children except E.M.T. Specifically, the trial court terminated Mother's parental rights based on statutory grounds (E) and (O) in subsection 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O). The trial court also found that it was in the children's best interests to terminate Mother's parental rights. *See id.* § 161.001(b)(2).

The trial court's order terminated Father C.T.'s parental rights to J.A.T., finding clear and convincing evidence of statutory grounds (E), (N), and (O), and that termination of Father C.T.'s parental rights to J.A.T. was in the child's best interest. *See id.* § 161.001(b)(1)(E), (N), (O); 161.001(b)(2). The trial court's order did not terminate Father C.T.'s parental rights to E.M.T. Both Mother and Father C.T. were granted possessory conservatorship of E.M.T.

The trial court's order terminated Father D.S.'s parental rights to E.C.S., E.M.S., and E.D.S., finding clear and convincing evidence of statutory grounds (E), (N), and (O), and that termination of Father D.S.'s parental rights was in his children's best interests. *See id.* § 161.001(b)(1)(E), (N), (O); *id.* § 161.001(b)(2).

The trial court's order terminated Father D.C.'s parental rights to E.A.C. for failure to legitimate. Alternatively, the trial court terminated Father D.C.'s parental right to E.A.C. under statutory grounds (N) and (O), and found by clear and convincing evidence that termination of Father D.C.'s parental rights was in E.A.C.'s best interest. *See id.* § 161.001(b)(1)(N), (O); *id.* § 161.001(b)(2).

---

[3] We refer to the children's maternal grandmother as "Maternal Grandmother."

Mother, Father C.T., Father D.S., and Father D.C. appeal.

STATUTORY REQUIREMENTS AND STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When reviewing the sufficiency of the evidence, we apply well-established standards of review. *See id.* §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (conducting a factual sufficiency review); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (conducting a legal sufficiency review).

"In reviewing the legal sufficiency of the evidence to support the termination of parental rights, we must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.B.*, No. 04-17-00364-CV, 2017 WL 4942855, at *2 (Tex. App.—San Antonio Nov. 1, 2017, pet. denied) (mem. op.) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a [reviewing] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

"In reviewing the factual sufficiency of the evidence to support the termination of parental rights, we 'must give due consideration to evidence that the factfinder could reasonably have found

- 4 -

to be clear and convincing.'" *J.L.B.*, 2017 WL 4942855, at \*2 (quoting *J.F.C.*, 96 S.W.3d at 266). "A [reviewing court] should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. "The [reviewing] court must hold the evidence to be factually insufficient if, in light of the entire record, the disputed evidence contrary to the judgment is so significant that a reasonable factfinder could not have resolved that disputed evidence in favor of the ultimate finding." *In re M.T.C.*, No. 04-16-00548-CV, 2017 WL 603634, at \*2 (Tex. App.—San Antonio Feb. 15, 2017, no pet.) (mem. op.).

Further, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *In re J.F.-G.*, 627 S.W.3d 304, 312, 317 (Tex. 2021). This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). We, therefore, defer to the trial court's factual determinations and judgment regarding credibility. *J.F.-G.*, 627 S.W.3d at 312; *see also In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts, however, must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

## BEST INTERESTS

Mother, Father C.T., and Father D.S. each challenge the sufficiency of the evidence to support the trial court's findings that termination of their parental rights was in their respective children's best interests.

*(A) Applicable Law*

When considering the best interest of a child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in section 263.307(b) of the Texas Family Code.[4] *See id.* § 263.307(b). We also consider the *Holley* factors.[5] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest,

---

[4] These factors include:

> (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child [or] the child's parents . . . ; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills . . . ; and (13) whether an adequate social support system . . . is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

[5] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, we must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### (B) The Children

Here, the trial court heard testimony about growing concerns for the children's safety and the children's significant trauma before removal. Mother conceded the children witnessed her go through withdrawals when she tried to quit using heroin. The children witnessed her become physically ill, unable to get herself up or use the restroom by herself, and constantly vomiting. Further, there was ample evidence that the children were neglected by Mother while she was abusing drugs.

For example, Mother was being evicted from her apartment and told Foster Mother—who was already involved with the family before removal—that Mother and all six of her children were going to live in Mother's vehicle. Foster Mother went to help Mother clean her apartment and discovered the children were left without supervision. E.A.C. was crying and sitting in a "very

soiled diaper[,]" and Foster Mother discovered she had open sores on her bottom and her feces were "an alarming shade of white." Foster Mother testified E.A.C. was almost a year old at the time but was very floppy and could not sit up straight. Foster Mother opined E.A.C.'s physical development was more like an infant or newborn rather than that of a one-year-old child. Foster Mother said the children were "extremely hungry" and "looked skinny." Foster Mother offered to let Mother and her children stay with her, but Mother chose instead to take the children to a hotel to stay with Mother's paramour at the time. Foster Mother stated the paramour had just been released from prison for armed robbery and opined he was unstable.

Although the timeline is unclear, the testimony indicates that at some point the children wound up in Maternal Grandmother's care. Several weeks later Maternal Grandmother asked Foster Mother for help because she was unable to care for the children and did not know where Mother was. When Foster Mother picked up the children, they told her they had not eaten. The children told Foster Mother they were left alone in Mother's apartment without food, and they had to escape to Maternal Grandmother's house to get food. Foster Mother testified she "could feel and see their bones through the backs of their shirts" and the children "talked about being left alone for long periods of time with strangers, with people they did not consider safe and were just zombies."

The testimony indicates the children were left to fend for themselves and search for basic necessities such as food. Dr. Conaway, E.C.S. and E.M.S.'s therapist, testified about a time she was engaged in play therapy with E.C.S. Dr. Conaway pretended Play-Doh was food, and, as she pretended to eat it, she told E.C.S. that it tasted salty. E.C.S. told Dr. Conaway the Play-Doh tasted like chemicals. Dr. Conaway asked E.C.S. how she knew what chemicals taste like, and E.C.S. responded she had to eat things that tasted like chemicals when she did not have any food.

Foster Mother testified the children would jump up and scurry into a corner and shake, growl, and bat at the foster parents when they would walk into the room. Their reactions made Foster Mother think the children were scared Foster Parents would hit them. The children told Foster Mother they were hit with belts, berated with vile language, and not taken to school.

Foster Mother testified J.A.T. was withdrawn when he first came into her care. He couldn't look anyone in the eye or talk to anyone because he was constantly terrified from his past traumatic experiences. He did not have good conflict management skills and only had violent interactions with his siblings. Foster Mother stated she and her husband ("Foster Father") learned the behavior J.A.T. exhibited had been modeled to him by Mother and Father C.T.

Dr. Conaway identified symptoms in E.C.S. consistent with trauma, including signs of disassociation, reactive attachment patterns, and significant difficulty maintaining emotional behavior regulation when faced with minor stressors. When E.C.S. talked to Dr. Conaway about her past traumatic experiences, she mentioned being "bullied" by Mother, and E.C.S. used the word "bullied" to describe when someone says mean things and hurts you. Dr. Conaway testified E.C.S. felt unsafe when Mother would bully her. Dr. Conaway explained she plays with the children and allows them to build narratives while they play with toys. She testified E.C.S. will experience disassociation symptoms and rapid mood swings when there is a violent narrative that comes out in play therapy. This has led to several instances where E.C.S. has to be physically carried out of Dr. Conaway's office by her foster parents. Dr. Conaway testified E.C.S.'s triggers arise from discussions about Mother and Father D.S. According to Dr. Conaway, consistent themes appear in the narratives created by E.C.S. while she played in therapy. The themes that often appear include family conflict, family violence, family separation, seeking safety from violence, and "a juxtaposition of . . . one safe space from a distinct unsafe place." For example,

Dr. Conaway stated there would be a distinct dollhouse that is "safe" and one that is "unsafe." The unsafe space tends to be characterized by "pay-offs, violence, conflict, and lack of access to resources." Given the description of the children's environment before they were removed, the trial court could have reasonably inferred the unsafe space E.C.S. described in her play therapy represented her experiences while in Mother's care, whereas the "safe" space represented her current placement with her foster family.

Dr. Conaway also described a therapy session with E.C.S. that occurred the day before Dr. Conaway testified at trial. Dr. Conaway stated:

> So our session yesterday, [E.C.S.] chose to play with humanoid animal figures. So those are animal figures that are kind of shaped and dressed like people, but they're animals.
>
> And in [E.C.S.'s] narrative yesterday she had a family of cats that adopted a baby bunny, and the baby bunny mentioned to the cat family that her parents abandoned her because she was too ugly[,] and they didn't want her anymore.
>
> And so[,] the cat family adopted the baby bunny, and the cat family gave the bunny food.
>
> And the baby bunny mentioned that she had never had any food before; that she had never had a kitchen with food in it; that prior to being with the cat family she would have to eat grass and things from outside.
>
> And as the narrative progressed, some panda figures entered the scene and knocked on the door of the home and indicated to the cat family that they were there to take the bunny back to her real family, and at which point the baby bunny in the narrative became afraid, and the cat family rallied around the baby bunny to protect her from being removed.

While Dr. Conaway could not say for sure that E.C.S. was the baby bunny, the trial court could have reasonably inferred E.C.S. was describing her own feelings given the context of her removal and placement with the foster family. *See* TEX. FAM. CODE ANN. §§ 263.307(b)(5), (12) (stating the trial court should consider whether the child is fearful of living in or returning to the

child's home and whether the child's family demonstrates adequate parenting skills in its best interest determination).

There were two pictures drawn by E.C.S. during therapy that were admitted into evidence. Dr. Conaway testified the two pictures were drawings on different sides of the same sheet of paper. On one side E.C.S. wrote "F*** You" below Father D.S.'s and Father D.C.'s first names. On the other side, there were four stick figures. One stick figure was wielding a knife, another stick figure was wielding a gun, a third stick figure was in a box with Father D.S.'s first name, and the fourth stick figure was in a box with Father D.C.'s first name. According to Dr. Conaway, E.C.S. identified herself as the stick figure stabbing one of the stick figures in the box, and she identified herself as the stick figure shooting the stick figure in the other box. E.C.S. wrote on this picture: "[H]appy Day of my Life."

The pictures and Dr. Conaway's testimony regarding the narratives that came out in play therapy are relevant to several best interest factors including: the children's mental vulnerabilities; the magnitude, frequency, and circumstances of the harm to the children; whether the children are fearful of returning to the home; the results of psychiatric, psychological, or developmental evaluations of the children; whether there is a history of abusive or assaultive conduct by the children's family; and whether the perpetrator of the harm to the children is identified. *See* TEX. FAM. CODE ANN. §§ 263.307(b)(1), (3), (5), (6), (7), (9). Based on this evidence, the trial court could have reasonably concluded it was in E.C.S.'s, E.M.S.'s, and E.D.S.'s best interests to terminate Father D.S.'s parental rights. The trial court could have also reasonably concluded that whatever the two men did to cause the enmity that provoked E.C.S. to draw these pictures happened while the children were in Mother's care and could have inferred Mother exhibited a pattern of failing to protect her children from her paramours. *See In re M.C.L. V*, No. 04-21-

00277-CV, 2022 WL 219002, at *6 (Tex. App.—San Antonio Jan. 26, 2022, no pet.) (mem. op.) ("A parent endangers her children by accepting the endangering conduct of other people.").

Foster Mother testified E.M.S. also had what she called "big trauma meltdowns" that were violent when she first came into Foster Mother's care. Foster Mother stated: "I think once she realized that we weren't going to hit her no matter what she did, something like clicked in her and she started calming down; but she also had a lot of lying and manipulative behaviors as well[.]"

Similar to E.C.S.'s play therapy narratives, E.M.S. showed a distinction between two families in her play therapy. In E.M.S.'s play therapy, she played with two distinct cat families who were visiting a restaurant. One family was sitting at a table with a lot of healthy food, and the other cat family was ordering a lot of unhealthy food. Dr. Conaway characterized this as a clear "distinction between safe and unsafe, healthy and unhealthy." Dr. Conaway testified she has observed symptoms in E.M.S. that were consistent with trauma such as significant aggression, making homicidal threats towards younger siblings, significantly high levels of anxiety, difficulty with emotional behavior regulations, and signs of disassociation.

Yadi Puente, E.D.S.'s therapist, testified E.D.S. initially showed a lack of self-care, inappropriate expression of emotions and would dysregulate. She would growl at people and get into fights at school. Puente diagnosed E.D.S. with "adjustment disorder with trauma and stress-related symptoms[,]" and she eventually modified the diagnosis to post-traumatic stress disorder.

Similar to her older sisters, E.D.S. would present themes of a "good family versus the bad family" during her play therapy narratives. She would sometimes call the two distinct families: good family and bad family, biological family and foster family, or first family and second family, though she has never directly stated which family is good or bad. According to Puente, the bad or evil family exhibited neglect, food insecurities, unstable living conditions, and demeaning

behavior towards one another. The good family, on the other hand, looks out for each other, always has food, and—though their space is small and cramped—they are united and safe. E.D.S. also played out themes of insecurity—including food insecurity—abandonment, neglect, and domestic violence. Puente testified there were times when the animal figures E.D.S. played with would be living in their vehicle or have to search for food. Puente stated there was always a search for food or shelter in E.D.S.'s play narratives. Given the testimony regarding the children's food insecurity and Mother's plan to live in her vehicle, the trial court could have reasonably inferred E.D.S. was playing out her own experiences while in Mother's care. According to Puente, E.D.S. dealt with low self-esteem issues when her siblings would tell her things like "nobody loves her[.]" Puente stated the biological parents in her play therapy used the same language and talked down to one another and the children. Finally, Puente also noted E.D.S. would play out physical abuse with the animal figures.

The trial court heard testimony the children are still working through the issues caused by Mother's neglect and the respective fathers' absence and failure to protect the children. The therapists treating E.C.S., E.M.S., and E.D.S. testified the magnitude of the harm experienced by the children is great and the children will likely need therapy for many years to deal with their traumatic experiences. *See* TEX. FAM. CODE ANN. § 263.307(b)(3) (providing "the magnitude, frequency, and circumstances of the harm to the child" as a factor considered by the trial court in its best-interest determination).

For example, Dr. Conaway testified E.C.S. avoids physical touch, and displays anger, sadness, and resistance to nurturance from caregivers and trusted adults. Because of these reactive attachment patterns, E.C.S. declines to seek comfort when she's experiencing distress. Dr.

Conaway explained this often results in chronic and potentially lifelong social and psychological difficulties.

Initially, E.C.S. and E.M.S. would exhibit reactive attachment behavior when the foster parents tried to comfort them. Dr. Conaway testified that over time the children have been increasingly willing to seek and receive comfort and nurturance from their foster parents when they are hurt or upset. E.C.S. would have a lot of major meltdowns and difficulty regulating her emotions when she first came into her foster parents' care. The testimony indicated E.C.S. would break things when she got upset. Foster Parents took the children to a neurofeedback provider, got them in counseling, and they are taking medication to help regulate their emotions. Foster Mother stated E.C.S. still has mood regulation issues, but they aren't as frequent or as intense, and she has not broken anything in a long time. Foster Mother opined E.C.S. is in a much better place now.

Foster Mother stated E.M.S. copes by trying to be in control. The foster parents have found ways to give her "healthy modes of control" and look for healthy ways for E.M.S. to use her leadership abilities. Foster Mother opined E.M.S. is now "doing very well[,]" is very social, and at the "top of her class in most subjects." When E.M.S. first came into the foster parents' care, she expressed a lot of violent behavior towards her siblings. According to Foster Mother, E.M.S. has been learning healthy conflict management skills and is now "very kind with her siblings."

Foster Mother testified E.D.S. "was in a constant state of mania" when she first came into Foster Mother's care. E.D.S. was "hypervigilant and hyperactive; screaming, making loud noises; [and] hitting constantly." She rarely showed authentic emotion and either expressed maniacal laughter or blurted out sounds. After several weeks in her care, however, Foster Mother opined E.D.S. began to feel safe and she crawled into Foster Mother's lap one day and began crying,

which surprised her siblings because they stated E.D.S. "never cries." Foster Mother believed E.D.S. "was finally able to kind of let some of that sadness and fear down." She stated from that point on, E.D.S. "really started to turn and make progress." Although E.D.S was "very violent" when she came into her foster parents' care, she has now learned healthier coping skills and has more positive interactions with her siblings.

The trial court heard testimony that J.A.T., who was fourteen years old at the time of trial, has consistently expressed his desire to be adopted by his foster parents and to not be reunified with Mother. The testimony indicated J.A.T. has spent minimal time with Father C.T. J.A.T. did not attend school for over two years prior to his removal from Mother's care. Naturally, this caused J.A.T. to perform well below grade-level. Foster Mother testified J.A.T. didn't interact with other students and didn't have any friends when he first started attending school again. Since he has been in the foster family's care, however, J.A.T. has caught up on his education, is currently on the honor roll, and received a perfect attendance award at school. J.A.T. also has developed friendships at school, is in the school orchestra, and excelling. Foster Mother opined: "He's up. He's confident. He is engaging. He's not as scared" to talk to people when they come up and shake his hand.

E.C.S., who was eleven years old at the time of trial, wants to be reunified with Mother. However, when discussions regarding reunification with her biological parents come up in therapy sessions, Dr. Conaway stated E.C.S. will dissociate to the point that she lies on the floor in the fetal position rocking back and forth. Under Mother's care, E.C.S. was also far behind in school and had to repeat a grade. Monica Clark, the Department's caseworker from November 2023 until May 2024, testified E.C.S. is currently doing well in school. Foster Mother corroborated Clark's testimony stating E.C.S. was in the ninety-ninth percentile for growth and has caught up on her

education quickly. Foster Mother opined E.C.S. is "now very social at school[,]" she loves her friends and teachers, she really enjoyed being in the school play, she loves visiting with her siblings, and is "in a much better place."

Clark testified E.M.S., who was nine years old at the time of trial, has not expressed whether she desires reunification or adoption. However, E.M.S.'s emotional and psychological issues have greatly improved since removal. Dr. Conaway stated E.M.S.'s aggression and issues with homicidal threats have almost completely resolved, and the intensity and frequency of her emotional dysregulation has decreased. But when Mother or Father D.S. are mentioned, E.M.S. becomes emotionally activated and enters a fight-or-flight mode or dissociates. E.M.S. is also doing well in school since coming into the foster parents' care. Initially, she was below grade level, but now she has ended the year on the honor roll and received the highest math scores in her class. E.M.S. has not indicated she wants to be reunified with Father D.S. Dr. Conaway testified E.M.S. has prompted discussions of adoption by the foster family, and E.D.S. mentions her foster parents when she talks about her future. According to Dr. Conaway, E.M.S. has a receptive reaction to adoption, though she still has mixed feelings about it. However, when they discuss reunification with her biological parents, Dr. Conaway testified E.M.S. would leave the room and stare at her reflection mumbling. *See* TEX. FAM. CODE ANN. § 263.307(b)(6) (providing the trial court should consider "the results of psychiatric, psychological, or developmental evaluations of the child" when determining the child's best interest).

Clark testified E.D.S., who was eight years old at the time of trial, wants to be adopted by her foster family. Foster Mother testified: "[E.D.S.] is very attached to [Foster Mother and Foster Father] and calls [them] Momma and Papa . . . ." Foster Mother stated E.D.S. "feels pretty secure in where she is, where she is in school, being with her siblings, all of that." Puente testified E.D.S.

is bonded with her foster parents. After therapy, E.D.S. will seek her foster parents' attention, lean on them, or ask for hugs. Puente opined there are positive interactions between E.D.S. and her foster parents. Foster Mother testified E.D.S. consistently comes to her crying and "saying she doesn't want to go back to her mommy; that she doesn't feel safe going back to her mommy." Foster Mother said the most recent instance of this occurred when Mother was showing the children a picture of her new van in a virtual visit. E.D.S. left the room. Foster Mother went to check on E.D.S. and she found her in another room "crying and shaking" because "she was scared to go back to mommy." *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (providing the trial court should consider whether the child is fearful of living in or returning to the child's home in its best interest determination). Puente stated E.D.S. also missed two years of school prior to removal. Although E.D.S. is struggling with reading, Clark testified the foster parents are addressing the issue. At the time of removal, E.D.S.'s verbal skills were undeveloped, she didn't know her letters or numbers, and didn't know the order of the days of the week. Foster Mother testified E.D.S. has been progressing quickly since coming into her care and they are working to overcome her educational deficit.

E.A.C., who was two years old at the time of trial, was too young to express her desires. Although she was originally placed in the same foster home as her siblings, she was later moved to a different foster home. Clark testified E.A.C. is doing well in this placement and both sets of foster parents ensure E.A.C. gets to visit and interact with her siblings. Prather, the Department's caseworker since May 2024, stated E.A.C. is doing well in her foster home and is very bonded with her foster family. E.A.C. was evaluated for early childhood intervention ("ECI") services when she was fourteen months old and it was determined she was at the developmental level of a six-month-old child. Although ECI recommended services while E.A.C. was in Mother's care,

Mother never set E.A.C. up with the ECI services. However, when she was placed in foster care, E.A.C. received ECI services to address her developmental delays and has since successfully graduated from ECI. She no longer has physical issues like sitting up. Foster Mother testified Mother was feeding E.A.C. dairy-based formula despite the pediatrician advising against it because of E.A.C.'s lactose intolerance. Foster Mother switched E.A.C. to non-dairy formula while she was in her care, and E.A.C. began developing quickly thereafter.

The trial court heard testimony from several witnesses—including the caseworkers, some of the children's therapists, and Foster Mother—that the children have all improved while in the foster parents' care. Foster Mother testified she and Foster Father recognize the trauma the children have gone through and utilize a trauma-informed parenting style to help the children cope and work towards positive emotional growth and development. Foster Mother has received over 100 hours of trauma-informed parenting training to become a therapeutic foster parent, has completed forty weeks of one-on-one, trauma-informed parent coaching, and spent approximately a year and a half doing weekly sessions with some of the children's therapist.

Foster Mother testified Foster Father has worked hard on his relationship with J.A.T. and would "meet him in whatever way he could." Foster Father would play video games or sports with J.A.T., and Foster Mother would sit with him in silence for long periods of time. Foster Mother stated that over time J.A.T. began to come out of his shell. According to Foster Mother, since coming into their care, J.A.T. "has learned a lot of healthy conflict management skills, so he's incredibly kind and gentle with his siblings and very supportive of them and really encourages them when they're having a hard time." Foster Mother stated J.A.T. is "a really sweet, wonderful kid" and "he's alive again."

Clark opined the current caregivers are meeting the children's physical and emotional needs now and can meet those needs in the future. J.A.T., E.C.S., E.M.S., and E.D.S. are all placed in the same foster home. Their foster parents have been involved in their lives since the foster parents agreed to adopt Mother's sixth child who is not subject to this suit.[6] E.A.C. was initially placed in the foster home with her siblings; however, she was placed in a different foster home in March or April 2023.

The Department's goal for the children is for adoption by their foster families. Foster Mother testified she and Foster Father are willing to adopt J.A.T., E.C.S., E.M.S., and E.D.S. When asked why Foster Parents want to adopt the children, Foster Mother replied:

> Because we love them[,] and we care for them. We're committed to their best good. We try every day to center their needs over our own needs and our own desires. And in order for them to heal and grow, we're willing to be a stable place for them as long as they need us.

Puente opined traumatized children require trauma-informed parenting and care, and Foster Parents are providing for E.D.S.'s emotional needs. Clark testified the caregivers have committed to being "a forever home" for the children they are currently caring for and can provide the children with a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied) ("The need for permanence is the paramount consideration for the child's present and future physical and emotional needs.").

---

[6] Mother put her sixth child up for adoption approximately four years before trial. The foster parents caring for J.A.T., E.C.S., E.M.S., and E.D.S. adopted Mother's sixth child shortly after he was born.

*(C) Mother's Appeal*

Mother admitted she was addicted to heroin before removal and recognized that her drug addiction caused her to neglect her children and contributed to their absence from school. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). Mother also recognized this neglect has caused severe emotional trauma for her children. Dr. Conaway opined E.C.S.'s and E.M.S.'s emotional development has been delayed. Further, the trial court heard testimony that Mother's youngest child, who was adopted by Foster Parents, was born with opioids in his system and had to be treated in the neonatal intensive care unit ("NICU") after he was born. *See id.* ("[E]ndangering conduct is not limited to actions directed towards the child."). Foster Mother testified Mother spent some time with the child while he was in the NICU but did not show up one day, and Foster Parents had to take over care of the child because he was going through withdrawals and needed consistent skin-to-skin contact. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) ("A trier of fact may measure a parent's future conduct by [the parent's] past conduct and determine whether termination of parental rights is in the child's best interest.")

Clark testified domestic violence occurred in several of Mother's relationships. *See In re A.H.*, No. 04-15-00416-CV, 2015 WL 7565569, at *7 (Tex. App.—San Antonio Nov. 25, 2015, no pet.) (mem. op.) ("Evidence of the parents' history of domestic violence supports the trial court's best interests finding."). Foster Mother testified E.D.S. made an outcry of abuse stating Mother would hit her with belts that would leave welts all over her body. *See* Tex. Fam. Code Ann. § 263.307(b)(7) (providing a trial court consider in its best interest determination "whether there is a history of abusive or assaultive conduct by the child's family or others who have access

to the child's home"). In addition to the food insecurity the children experienced under Mother's care, the trial court also heard testimony the children's medical care was neglected and some of the children had poor hygiene while under Mother's care. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *24 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (providing evidence of children's poor hygiene while in parent's care supported the trial court's findings that termination was in the children's best interests). Puente testified E.D.S. has expressed that she worries about Mother and does not think Mother is able to change.

A service plan was created for Mother to address the concerns that led to removal. The service plan was admitted into evidence. Mother was required to participate in drug treatment, parenting classes, domestic violence classes, therapy, and a psychological evaluation, and follow all recommendations from her drug assessment and psychological evaluation. Although the case began in October 2022, Mother did not complete her psychological evaluation until February 28, 2024. Pursuant to the recommendations from the psychological evaluation, Mother was required to participate in individual counseling and a domestic violence course. The trial court heard testimony that Mother largely maintained her sobriety throughout the case. Mother was however arrested for public intoxication during the case. Aside from the drug issues—which appeared to be largely resolved—Clark considered individual counseling and the domestic violence course to be the most important services Mother needed to complete. Clark testified Mother began her domestic violence course in October 2023—approximately one year after the children were removed—but had not completed it at the time of trial. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("A [factfinder] may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that

he does not have the ability to motivate himself to seek out available resources needed now or in the future.").

Prather testified Mother needed individual counseling to address the trauma she caused her children while they were living with her and to work through how she can better cope and be a better parent for the children. Prather opined it is important for the parents to address the reasons for removal through individual counseling and acknowledged neither Mother nor Father D.S. engaged in counseling until April 2024—the same month trial commenced. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (providing the trial court should consider "the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision" when making a best-interest determination). Foster Mother testified there were times before removal when she would walk up to Mother's home and hear Mother yelling obscenities at the children inside the home. When Mother answered the door to let Foster Mother in, "everything would stop[,] and everyone would act . . . like nothing was going on." Foster Mother testified Mother's house would often be covered in garbage, animal feces, and broken glass. *See In re A.L.H.*, No. 04-20-00452-CV, 2021 WL 1110612 at *6 (Tex. App.—San Antonio Mar. 24, 2021, pet. denied) (mem. op.) ("This court has recognized that evidence of neglect, such as unsanitary conditions in a home, supports a trial court's best interest finding.") Based on this testimony, the trial court could have agreed with Clark that engaging in individual counseling was essential for Mother to provide the children with a safe and stable home. However, Mother delayed engagement in individual counseling until just before trial commenced.

Mother told her caseworkers that she was engaged in individual counseling but refused to sign a release of information so the caseworkers could verify the individual counseling was addressing the Department's concerns. Clark testified she repeatedly asked Mother to sign the

release since Clark was assigned to the case in November 2023, and Mother refused. In February 2024, the trial court ordered Mother to sign the release of information. Mother provided the release to Clark in March 2024. Clark discovered the individual counseling Mother claimed to be receiving was actually drug therapy pursuant to her drug treatment program and did not satisfy the individual counseling requirement on her service plan. As mentioned above, Mother did not engage in individual counseling to address the Department's concerns until just before trial, nearly a year and a half after the children were removed. While the trial court could have believed Mother was unaware her drug therapy did not satisfy her individual counseling requirement, it could have also believed that Mother intentionally declined to sign the release of information because she did not want to engage in individual counseling or facilitate the Department's close supervision. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *see also In re E.A.M.V.*, No. 04-18-00866-CV, 2019 WL 1923214, at *4 (Tex. App.—San Antonio May 1, 2019, pet. denied) (mem. op.) (explaining a trial court could have disbelieved a parent's testimony, and we defer to the factfinder on witness credibility issues).

Notwithstanding completion of the parenting class, Clark stated she was concerned with Mother's ability to parent all six children. Clark stated Mother was unable to manage the children during visits she observed. Based on Clark's concerns, Mother was required to take a second parenting class. At the time of trial, Mother had started the second parenting class but had not completed it.

Although the trial court heard testimony Mother has maintained her sobriety, it also heard testimony that Mother was expelled from the family drug court program for failure to abide by her contract with the court. Vanessa Knight, the Family Drug Court monitor for Mother, testified Mother has a three-year history of substance abuse with methamphetamines although she did not

test positive for illegal drugs during the case. Clark also testified she is concerned Mother has an ongoing relationship with a paramour she met in rehab. Knight testified Mother's paramour initially did services with Mother while she was in the family drug court program; however, the paramour withdrew from the program approximately forty days later. Clark stated she was concerned the paramour was no longer engaged in services and there were concerns she may be abusing drugs again. Because Mother's "relationships are what usually drives her into her substance abuse[,]" Clark testified she is concerned Mother's paramour may cause Mother to relapse, thereby creating an unstable and unsafe environment for the children. Mother was warned that her continued relationship with her paramour jeopardized her parental rights. Knight testified that Mother's relationship with a drug addict who "was continuously using [drugs]" and not engaging in services was a violation of her contract with the family drug court. Knight opined Mother would have made it through the family drug court program but for Mother's continued relationship with her paramour.

Mother claimed she ended the relationship when the paramour stopped engaging in services. The Department, however, presented evidence indicating Mother continued her relationship and hosted a birthday celebration for her paramour many months after she allegedly ended their relationship. Knight and Clark both testified they believed Mother continued her relationship with the paramour after Mother claimed the relationship ended. It is the trial court's province to resolve disputed evidence and determine witness credibility. *See J.F.-G.*, 627 S.W.3d at 317. Here, based on the disputed evidence, the trial court could have reasonably believed Mother continued her relationship with another drug addict who "was continuously using" and was not engaged in services. The trial court could have also reasonably inferred this relationship

would pose a danger to the children, especially considering the extensive past trauma the children experienced when they were neglected by drug-addicted caregivers.

Foster Mother stated she was concerned Mother has not addressed the underlying issues that created the unsafe conditions for the children. To support her conclusion, Foster Mother testified one of the issues that led to removal was Mother's tendency to expose the children to unsafe paramours. Foster Mother indicated she believed Mother was still in a relationship with the paramour she met in rehab. This concerns Foster Mother because of the high rate of relapse when two former drug addicts are in a relationship. Foster Mother testified that Mother plans to marry this paramour who is not engaged in any services despite a history with drug addiction. Foster Mother opined this is another example of Mother continuing to place her desires above her children's needs.

Mother consistently attended visits. However, the children's therapists recommended a change to virtual visitations because the children became violent with each other after in-person visits with Mother. Puente testified that a lot of E.D.S.'s aggressive behavior subsided and communication improved between E.D.S. and her foster parents when Mother's visits were changed from in-person to virtual. Clark stated most of the visits with Mother were virtual. Clark testified most of the children looked forward to visitation with Mother, but J.A.T. rarely participated or engaged in the virtual visitations.

The trial court also heard testimony that Mother gave E.M.T., who was sixteen years old at the time, a vape containing THC during a visit. Mother's action—giving an underaged child an illegal substance—indicates the parent-child relationship between Mother and any of the children is inappropriate. *See Holley*, 544 S.W.2d at 372 (stating the trial court should consider in its best-

interest determination any acts of the parent which may indicate the existing parent-child relationship is not a proper one).

*(D)  Father C.T.'s Appeal*

Father C.T. has been convicted of aggravated assault with a deadly weapon and is currently serving his sentence for a conviction of assault causing bodily injury.  Despite exhaustive efforts, Clark was unable to locate Father C.T. until she discovered he was incarcerated.  Clark testified Father C.T. has been incarcerated since March 2024 and that she sent him letters while he was in jail.

A service plan, which was admitted into evidence, was created for Father C.T. to rectify the concerns that led to J.A.T.'s removal.  Father C.T. was required to participate in drug treatment, a domestic violence course, parenting classes, and a psychological evaluation.  Father C.T. claims he has completed his services, but Clark testified she has not been provided with proof of completion of any services.  Father C.T. has not participated in visitation and has neither sent letters to J.A.T. nor inquired about his welfare.  Clark stated Father C.T. made no effort to contact her or respond to her requests that he work services.  Clark opined Father C.T.'s current incarceration is an impediment to his ability to provide for J.A.T.  "Criminal conduct, prior convictions, and incarceration affect[] a parent's life and his ability to parent, thereby subjecting his child to potential emotional and physical danger."  *See In re J.J.O.*, No. 04-18-00425-CV, 2018 WL 5621881, at *2 (Tex. App.—San Antonio Oct. 31, 2018, no pet.) (mem. op.).

Foster Mother testified Father C.T. has not been present in J.A.T.'s life, J.A.T. feels discarded by Father C.T., and J.A.T. has not asked about Father C.T.  *In re K.A.D.K.*, No. 04-15-00758-CV, 2016 WL 1587535, at *6 (Tex. App.—San Antonio Apr. 20, 2016, pet. denied) (mem. op.) ("A parent's inability to provide adequate care for a child, lack of parenting skills, and

poor judgment may be considered when examining children's best interests."). Foster Mother stated Father C.T. would use drugs around J.A.T. and would hit J.A.T. *See* TEX. FAM. CODE ANN. § 263.307(b)(7), (8). According to Foster Mother, Father C.T. has been charged with multiple domestic violence offenses and has been in and out of jail.

Father C.T. testified he is currently incarcerated for aggravated assault, and he has been absent from J.A.T.'s life due to his drug abuse. Father C.T. admitted to an extensive criminal history involving drugs, burglary, resisting arrest, and assault, though he has only been convicted for drug and burglary charges. *See J.J.O.*, 2018 WL 5621881, at *2.

Father C.T. testified he is willing to sign an affidavit of relinquishment if J.A.T. is placed with his paternal grandmother so she can adopt him. *See In re K.S.L.*, 538 S.W.3d 107, 111–12 (Tex. 2017) (holding, though not always sufficient by itself, "[a] parent's willingness to voluntarily give up her child, and to swear affirmatively that this is in her child's best interest, is sufficient, absent unusual or extenuating circumstances, to produce a firm belief or conviction that the child's best interest is served by termination").

### (E) Father D.S.'s Appeal

The trial court heard testimony that Father D.S. never intervened to protect the children from Mother's drug abuse or neglect, despite being aware of it. Father D.S. testified he stopped paying child support before removal because Mother was using the child support to buy drugs. *See In re A.L.*, No. 04-14-00365-CV, 2014 WL 5197774, at *3 (Tex. App.—San Antonio Oct. 15, 2014, no pet.) (mem. op.) ("A parent's lack of significant contact with or support of a child can also subject the child to a life of uncertainty and instability that endangers the child's physical and emotional well-being."). This testimony indicates Father D.S. knew that Mother was using drugs while caring for the children and failed to take steps to protect the children from that drug induced

and neglectful environment. Based on this evidence, the trial court could have reasonably inferred that Father D.S. lacks the ability to provide for his children's physical and emotional needs, and his disregard for their safety poses a physical and emotional danger to the children. *See id.* ("A parent's lack of contact with a child without any excuse and failure to take steps to ensure the child's safety are evidence of endangerment."); *see Holley*, 544 S.W.2d at 372 (listing the emotional and physical needs of and dangers to the child now and in the future as best-interest factors).

Clark testified Father D.S. faulted Mother for the children's removal and did not take any responsibility for the children being in the Department's care. Carlos Castillo-Nunez, Father D.S.'s counselor, corroborated Clark's testimony stating Father D.S. failed to understand why he was involved with the Department because Father D.S. believed the problems leading to removal stemmed from Mother's drug issues. Castillo-Nunez stated Father D.S. saw himself as the victim and did not see the need to participate in services because he did not have any issues with his children.

Clark and Mother testified there was domestic violence between Mother and Father D.S. "A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being." *A.H.*, 2015 WL 7565569, at *7 ("Evidence of the parents' history of domestic violence supports the trial court's best interest[] findings."). Father D.S. has two convictions for assault arising from domestic violence. Although one of the convictions dated back to 2008, the most recent conviction arose from an incident between Father D.S. and his wife in 2023. As a result of the 2023 domestic violence incident, Father D.S. was incarcerated for eighty-five days and released pursuant to a plea bargain agreement after pleading no contest to a family assault charge. Although Father D.S. claimed he has never been the aggressor in the domestic violence

incidents, the trial court could have disbelieved Father D.S.'s self-serving testimony. Instead, the trial court could have given considerable weight to Father D.S.'s convictions arising from two separate domestic violence incidents and believed Mother's testimony that Father D.S. physically abused her. E.M.T., the oldest child who is not subject to this appeal, also testified that Father D.S. physically abused her. E.M.T. stated: "I talked back to my mom one day, and he slapped me multiple times on my face[,] and he busted my lip." Father D.S. told E.M.T. to lie and state that one of her sisters hit her if someone asked what happened to her lip. E.M.T. also testified she saw Father D.S. physically abuse Mother and some of E.M.T.'s siblings. Further, Father D.S.'s mother testified he admitted to her there was domestic violence between him and Mother, but the children did not witness it because they were in the other room.

The trial court also heard evidence indicating the parent-child relationship between Father D.S. and his children may be detrimental to the children. *See Holley*, 544 S.W.2d at 372 (holding, in a best interest determination, the trial court should consider the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one). For example, the trial court could have reasonably inferred that the pictures mentioned above that were drawn by E.C.S. indicates there is a discordant relationship between Father D.S. and his children. Puente testified E.D.S. would also play out sexual abuse in her play therapy narrative. Although E.D.S. did not identify the perpetrator or the victim of the sexual abuse—and ignored Puente's questions regarding the sexual abuse—the theme first came up in the four therapy sessions after visitation with Father D.S. was mentioned to E.D.S. Puente described the play narrative and stated "a stuffed animal was out to hurt more other stuffed animals," and E.D.S. told her the stuffed animal "was a male" that "was inappropriately touching some of the other stuffed animals[,]" and "it was about to hurt."

Further, Foster Mother testified Father D.S. has not interacted with his children in the four years Foster Mother has been involved with the family despite a court order allowing Father D.S. to exercise supervised visitation during that time. Clark testified a virtual visit was set up between Father D.S. and his children. According to Clark, E.C.S., E.M.S., and E.D.S. hid under the table the computer was sitting on during the virtual visit because they did not want to visit with Father D.S. The children finally sat down in front of the computer approximately thirty minutes into the first visit. Clark stated E.C.S. "just kind of sat there" unengaged, E.M.S. became very hyperactive during the visit, and E.D.S. was not interested in the visit. Clark opined subsequent visits got worse, although Father D.S. was able to get the children engaged when he would bring his dog on the camera. Clark testified the children recognize Father D.S., but do not have a bond with him.

The trial court heard testimony about E.C.S.'s recent meltdown before and after a virtual visit with Father D.S. According to Foster Mother, "[w]hen it was getting close to time to turn on the computer, [E.C.S.] huddled in the hallway, shaking and crying and not wanting to go in." When she finally calmed down, "she regressed into animal-like behavior and scurried into the room on her hands and knees and sat at the computer." E.C.S. had a series of violent meltdowns the rest of the evening after the virtual visit.

When Puente asked E.D.S if she wanted to have visits with Father D.S., E.D.S. reacted negatively, her pulse shot up, and she withdrew and "went to [a] corner [of the room] staring at the wall." E.D.S was unresponsive to verbal cues and only responded when Puente touched her shoulder. E.D.S. shouted Father D.S. wasn't her father, she didn't want to see Father D.S., and stated "[h]e hurts mommy."

Foster Mother opined the children need consistency and stability, and Father D.S. has been neither consistent nor stable for the children. To support her contention, Foster Mother stated

Father D.S. has been in and out of jail and did not avail himself of the opportunity to have supervised visits prior to removal. *See J.J.O.*, 2018 WL 5621881, at *2. Foster Mother also opined the children need parents with the capacity to care for high-needs, highly traumatized children. *See In re S.D.*, 980 S.W.2d 758, 764 (Tex. App.—San Antonio 1998, pet. denied) (holding it was in the children's best interests to place them "in a stable environment where they can receive proper care for their special needs").

The service plan created for Father D.S. was also admitted into evidence. Father D.S. was required to participate in drug treatment, and successfully complete a domestic violence course, parenting classes, individual counseling, and a psychological evaluation. Clark testified she went over Father D.S.'s service plan with him in December 2023 and he understood what was required of him. Clark testified the only thing Father D.S. has completed is the parenting course. Father D.S. engaged in individual counseling but was unsuccessfully discharged. Father D.S. reengaged in individual counseling; however, he was unsuccessfully discharged again for failing to recognize his past involvement in domestic violence. Castillo-Nunez testified Father only attended four sessions of counseling and did not return after Castillo-Nunez told Father D.S. he was showing signs of a personality disorder. Father D.S. was appropriate in sessions but he did not see the need for counseling. *See* TEX. FAM. CODE ANN. § 263.307(b)(10). Castillo-Nunez opined that Father D.S. showed a lack of remorse or compassion for his children's situation and put his needs above his children's needs. Father D.S. did not start his domestic violence course until late-May or early-June 2024.

Despite the case being nearly two years old at the time of trial, Father D.S. did not engage in services until six months before trial. Father D.S. claims he did not engage in services sooner because he had difficulty maintaining contact with his caseworkers. However, Clark testified she

consistently tried to contact Father D.S. since she was assigned the case in November 2023. She continued to call the phone number she had for Father D.S. and was finally able to contact him in December 2023 despite using the same phone number. Father D.S. also testified he was in a shelter for approximately six-months with three of his children that are not the subject of this suit. Father D.S. testified he was unable to do services while he was living in the shelter and caring for the other children. The trial court could have rejected these excuses or otherwise believed Father D.S.'s failure to engage in services demonstrates an unwillingness to facilitate the Department's close supervision or effect positive environmental and personal changes within a reasonable period of time. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11). The trial court could have also inferred Father D.S.'s long stay at the shelter indicates there is instability in his life that could pose a physical or emotional danger to the children, especially considering the past trauma these children have experienced due to parental instability.

*(F) The Best-Interest Evidence is Sufficient*

Based on all this evidence, Clark opined Mother and the fathers have not made the necessary changes to show preservation of their parental rights is in the children's best interests. According to Clark, the parents have not demonstrated they can care for the children's physical and emotional needs of their respective children now or in the future, and the biological parents cannot provide a safe environment for the children. Clark testified she is especially concerned with the parents' failure to even attempt to address the domestic violence issues until the very end of the case despite every parent having a history of domestic violence. The trial court heard a plethora of testimony regarding Mother's failure to engage in individual counseling to address the neglect and trauma she caused the children. Finally, the record indicates the trial court spoke to J.A.T., E.C.S., E.M.S., and E.D.S. in chambers before it signed the termination order.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's, Father C.T.'s, and Father D.S.'s parental rights were in their respective children's best interests. *See id.* § 161.001(b)(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also generally In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (recognizing a reviewing court need not detail the evidence if affirming a termination judgment). Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest findings.

Accordingly, Mother's, Father C.T.'s, and Father D.S.'s sole issues are overruled.

## FATHER D.C.'S APPEAL: PRESENCE AT TRIAL

In his sole issue, it appears Father D.C. argues the trial court violated his right to due process when it proceeded to trial on the fourth and fifth days without Father D.C.'s presence.

Father D.C., who was incarcerated during the trial, initially appeared at trial via Zoom.[7] The fourth day of trial was set for June 25, 2024; however, Father D.C. did not appear that day. Father D.C.'s counsel stated Father D.C. had a right to be at trial and requested the court secure his presence. The trial court acknowledged an oversight in securing Father D.C.'s presence. The trial court stated it would attempt to contact the facility where Father D.C. was incarcerated to secure his presence and went off the record. When the trial court came back on the record, it stated:

> Today is June 25th. This matter was scheduled to resume trial today at 8:30. We are having to continue this matter. And the reason is that [counsel] in his representation of . . . [Father D.C.] previously [provided an order for Father D.C.] to be present. When we broke testimony on May 31st, 2024, this Court made clear with the facilit[y] that we were going to need [Father D.C.] on today's date so that

---

[7] It is unclear whether Father D.C. appeared on the first two days of trial. However, Father D.C.'s brief indicates he was present, and he does not assert any complaints on appeal regarding his presence on the first two days of trial. The record reflects Father D.C. was present via Zoom on the third day of trial.

we can continue. Unfortunately, [Father D.C.] is [not] present. And so the Court is going to have to under [section] 263.4011 [of the family code] grant an extension to the commencement of trial rule, which typically has trial ending within 90 days. Good cause does exist, and that's the fact that we're missing . . . necessary parties to continue today.[8] We're going to come back . . . July 12th at 9:00 a.m. [Counsel], go ahead and resubmit the orders ordering [Father D.C.'s presence]. Do it by the end of the week so that we can make sure that the facilit[y] ha[s] that and we don't have any issues going forward. . . . The Court is going to block off all day for this case. Please be cognizant of that. Please don't take any other settings in any other courts because we need to get this done.

The trial court also told the parties to reserve July 16, 2024 for the fifth day of trial.

On July 12, 2024, the trial resumed. Father D.C.'s counsel announced not ready because Father D.C. did not appear via Zoom. The trial court stated on the record that counsel submitted the necessary paperwork to request Father D.C.'s presence via Zoom, and the trial court verified the paperwork was correctly processed. The trial court stated it was expecting Father D.C. to appear but nevertheless overruled Father D.C.'s "not ready" announcement, stating "we are going to move forward[,]" but noting "counsel did request the client to be here." The trial court later discovered Father D.C. did not appear because the facility where Father D.C. was incarcerated was without power "and ha[d] no ability to get him on" Zoom. Counsel then orally moved for a continuance. The trial court denied the oral motion for a continuance.

On the fifth day of trial, the trial court stated the facility where Father D.C. was incarcerated was still without power. Father D.C.'s counsel stated he was likewise informed but did not move for a continuance, assert an objection, or make a "not ready" announcement. The trial court just stated "we're going to move forward at this time."

On appeal, Father D.C. complains that the trial court denied his request to be present at trial, violating his due process rights. However, the record clearly shows the trial court issued the order to secure Father D.C.'s presence at trial. When it was discovered that Father D.C.'s failure

---

[8] Father C.T. was also incarcerated and did not appear despite counsel's request for his presence at trial.

to appear was due to a power failure, counsel made an oral motion for continuance that the trial court denied.

To the extent Father D.C. complains the trial court's denial of his "not ready" announcement deprives him of constitutional rights, we note Father D.C. never raised a constitutional complaint in the trial court as required to preserve the issue for appellate review. *See In re M.N.R.*, No. 04-22-00025-CV, 2022 WL 2230928, at *2 (Tex. App.—San Antonio June 22, 2022, no pet.) (mem. op.) (holding Mother failed to preserve constitutional complaint for review when it was not raised in her "not ready" announcement or asserted after the trial court denied the "not ready" announcement).

As a prerequisite to presenting a complaint for appellate review, the record must show the complaint was made to the trial court through a timely request, objection, or motion with sufficient specificity, and that the trial court ruled or refused to rule on the complaint. *See* TEX. R. APP. P. 33.1(a); *see also In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) ("Under our Rules of Appellate Procedure, a party must present to the trial court a timely request, motion, or objection, state the specific grounds therefor, and obtain a ruling."); *In re A.N.G.*, No. 04-16-00377-CV, 2016 WL 6775589, at *1 (Tex. App.—San Antonio Nov. 16, 2016, no pet.) (mem. op.) ("Before presenting a due process complaint in an appeal from an order terminating parental rights, the appellant must have timely raised the due process complaint in the trial court."). "Allowing appellate review of unpreserved due process complaints in termination cases 'would undermine the [l]egislature's intent that cases terminating parental rights be expeditiously resolved.'" *A.N.G.*, 2016 WL at 6775589, at *1 (quoting *L.M.I.*, 119 S.W.3d at 711). Here, Father D.C. made no constitutional arguments regarding his absence on the fourth and fifth days of trial.

Moreover, it was Father's burden to identify with sufficient specificity the grounds for the ruling he sought and provide factual information to the trial court to assess the necessity of his appearance. *See In re D.C.C.*, 359 S.W.3d 714, 716 (Tex. App.—San Antonio 2011, pet. denied). "As a constitutional matter, litigants may not be denied reasonable access to the courts simply because they are inmates." *In re R.F. III*, 423 S.W.3d 486, 492 (Tex. App.—San Antonio 2014, no pet.) (citing *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003)). "However, an inmate does not have an absolute right to appear in person in every court proceeding." *R.F. III*, 423 S.W.3d at 490 (citing *Z.L.T.*, 124 S.W.3d at 165). To the contrary, "the inmate's right of access to the courts must be weighed against the protection of our correctional system's integrity." *Z.L.T.*, 124 S.W.3d at 165. Because "a prisoner has no absolute right to be present in a civil action, it follows that the prisoner . . . must justify the need for his presence." *Id.* at 166. "A litigant's status as an inmate does not alter that burden." *Id.* While the supreme court has identified several factors the trial court should consider when an inmate litigant requests to be present in a civil court proceeding, it held the burden remains on the litigant to provide evidence of the factors and the trial court does not have an independent duty to identify and evaluate the factors on the record. *Id.* at 165–66. Accordingly, we have repeatedly held the trial court does not abuse its discretion by proceeding with trial in a parental termination case when the inmate litigant fails to make a record showing his presence would have resulted in a different outcome or his presence was otherwise necessary. *See D.C.C.*, 359 S.W.3d at 716–17 (holding trial court did not abuse its discretion in declining to postpone parental termination trial—when arrangements to have an incarcerated parent appear were inexplicably not made despite a court order to secure her presence—because the parent's counsel failed to "satisfy [the parent's] burden of identifying with sufficient specificity the grounds for the ruling she sought and provide factual information to assess the necessity of her

appearance"); *R.F. III*, 423 S.W.3d at 493 ("[G]iven [Father's] counsel's failure to make an offer of proof regarding [Father's] need to testify, the trial court's decision to terminate [Father's] parental rights in his absence did not violate his due process rights."); *In re R.R.C.*, No. 04-17-00043-CV, 2017 WL 2562377, at *4 (Tex. App.—San Antonio June 14, 2017, no pet.) (mem. op.) ("Because counsel did not file a continuance or make any record of appellant's need to testify, on this record we must conclude the trial court did not violate appellant's due process rights by denying his 'not ready' announcement.").

Here, Father D.C.'s counsel did not make any record showing Father D.C.'s need to testify or a showing of why his presence was necessary. Nor did he file a written, verified motion to continue the trial containing this information. Thus, on this record, we conclude the trial court did not abuse its discretion when it proceeded with trial without Father D.C. *See Z.L.T.*, 124 S.W.3d at 166; *D.C.C.*, 359 S.W.3d at 717.

Finally, we note that in a parental termination case, the goal of establishing a stable, permanent home for a child is a compelling government interest that may justify the trial court's decision to proceed with trial despite Father's absence. *See In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *2 (Tex. App.—San Antonio Aug. 3, 2022, no pet.) (mem. op.) (concluding the trial court did not abuse its discretion when it denied a motion for continuance when the motion did not comply with Rule 251 and permanency for the children in a parental termination case justified the denial); *see also In re J.P.H.*, No. 04-23-00131-CV, 2023 WL 5280376, at *8 (Tex. App.—San Antonio Aug. 16, 2023, pet. denied) (mem. op.). The original petition prompting the removal of the children was filed on October 12, 2022. Trial commenced approximately eighteen months later, well beyond the one-year statutory deadline and approaching the end of the six-month extension to resolve the case. *See* TEX. FAM. CODE ANN. § 263.401(a), (b). Although trial

commenced in early April 2024, the second day of trial was continued until early May 2024. The third day of trial did not proceed until May 31, 2024. The fourth day of trial was originally set for June 25, 2024, nearly a month later. The trial court already delayed the fourth day of trial once because Father D.C. did not appear. However, the trial court agreed to continue the fourth day of trial because Father D.C.'s absence was due to an administrative oversight. The trial court noted the trial had already exceeded the statutory ninety-day deadline imposed on the trial court to render an order on termination under section 263.4011 of the family code, and the trial court expressed its intent to bring the trial to conclusion within the next two settings.[9] To continue the trial again on July 12, 2024 would have only further delayed permanency for the children. On this record, we cannot conclude the trial court abused its discretion.

Accordingly, Father D.C.'s sole issue is overruled.

**CONCLUSION**

The trial court's termination order is affirmed.

Irene Rios, Justice

---

[9] Section 263.4011 of the Texas Family Code provides: "On timely commencement of the trial on the merits under [s]ection 263.401, the court shall render a final order not later than the 90th day after the date the trial commences." TEX. FAM. CODE ANN.§ 263.4011(a).